**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JOHN DOE, individually and on behalf of others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 19-CV-** |
| **DONALD J. TRUMP, in his official capacity as President of the United States, MATTHEW WHITAKER, in his official capacity as Acting Attorney General of the United States, and THOMAS E. BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**COMPLAINT**

Comes now Plaintiff, John Doe, individually and on behalf of others similarly situated, by and through their undersigned attorneys, Thomas G. Maag and the Maag Law Firm, LLC, and for their cause of action, states as follows:

**COUNT I
(18 U.S.C. 922(o) Does Not Prohibit An Initial Registration Period / Amnesty)**

1.  At all times relevant, Plaintiff John Doe ("Doe") is a citizen and resident of the Southern District of Illinois, is not a "prohibited person" under 18 USC 922(g), or any state law in effect in Illinois, and lawfully possesses firearms. That "John Doe" is not Plaintiff's actual name, but rather is a fictitious name for an actual person as herein described, in order to protect his or her actual identity, which is protected under the 5th Amendment, and the facts alleged herein. That Defendants are each sued in their *official* and not individual capacities, and are DONALD J. TRUMP, in his official capacity as

President of the United States, MATTHEW WHITAKER, in his official capacity as Acting

Attorney General of the United States, and THOMAS E. BRANDON, Acting Director,

Bureau of Alcohol, Tobacco, Firearms, and Explosives, and are the three most responsible

persons and /or offices responsible for the conduct alleged herein.

2. That Plaintiff is in possession, and has been in possession, of one or more bump stock
   and/or bump firing devices, since prior to December 18, 2018, that were purchased or
   otherwise acquired in accordance with all applicable laws, rules, regulations and rulings
   in effect prior to December 18, 2018, and in light of the recent reclassification of same by
   Defendants, he seeks to lawfully register same in the National Firearms Registration and
   Transfer Record, or, in the alternative, if registration is legally impossible, seeks just
   compensation under the Fifth Amendment, for a total regulatory and/or actual taking.

3. That, as set forth in more detail herein, Plaintiff is in fear of actual arrest and prosecution
   should his or her actual true name be known, due totally and exclusively to his prior
   lawful conduct and his continued possession of certain items that he previously lawfully
   acquired, due to recent directive of President Donald Trump, DOJ rulings and CFR
   changes, as set forth herein in more detail, and thus, Plaintiff asserts his 5th Amendment
   right to remain silent, as to his name and more detailed identification, in order to litigate
   this matter, herein, and to protect him from actual arrest and prosecution. Plaintiff would
   be happy to file his name with the Court upon being provided sufficient enforceable
   guarantees of immunity, either while this case proceeds, or at the successful ultimate
   conclusion of litigation, if and when he is no longer subject to potential criminal liability
   due to possession of previously ATF approved and later reclassified items.

4.  In 1934, the United States Congress passed and enacted the National Firearms Act of 1934, which placed certain tax and registration requirements on certain firearms defined in the act, including "machineguns" silencers and certain firearms with were deemed concealable, but not including pistols and revolvers.  See. Ex. A (Original 1934 era IRS Form 1, Firearms).  The point of the statute was to strictly regulate these items, based on the (correct) understanding, testified to by then then U.S. Attorney General, that the federal government lacked the authority to simply outlaw them, but could tax them in the manner of the Harrison Anti-Narcotic Act.

5.  That these taxes were, subject to certain minor exceptions, initially $200.00 for the making and transfer of a firearm, and $200.00 per year for businesses dealing in, importing or manufacturing said kinds of firearms.  There was no tax due on the mere registration of a firearm, nor could there be, as it would be a "direct tax" prohibited by the Constitution.

6.  That subject to certain exceptions, a person possessing such a firearm on the date of enactment of the NFA, had a 60 day initial registration period to register said firearm with the Commissioner of Internal Revenue, today called the Internal Revenue Service, or IRS.  (Ex A)  In 1972 the functions of the NFA were transferred to the Bureau of Alcohol, Tobacco and Firearms, which was ultimately renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives, and transferred into the Department of Justice, despite being an internal revenue tax that is now collected by other than the Department of the Treasury.

7.  That while it was a felony offense to possess an unregistered firearm after the initial 60 days, under the terms of the statute, any person so possessing such an unregistered

firearms was allowed to, and in fact, was required to, register such a firearm, utilizing IRS Form 1 (Firearms).  See Ex. B, Example of 1965 Era IRS Form 1 (Firearms). Sometimes these applications were approved, other times they served as the basis to prosecute applicants.

8. From 1934 to 1960, Congress exacted minor changes to the original NFA, such as reducing the transfer tax rate for firearms classified as "any other weapon" to $1.00 and then $5.00, respectively, exempting certain "collectors items" and "antiques."

9. In 1968, in a trio of cases in the Supreme Court ending with *Haynes v. United States*, the criminally enforceable *requirement* to register an unregistered NFA firearm was ruled unconstitutional under the 5th Amendment, self incrimination clause, as the statute did not simply *permit* registration of technically contraband firearms, it *required* it, under penalty of criminal prosecution, and the form used to register said contraband firearm required a registration applicant to, in fact, admit, under penalties of perjury, that the applicant was breaking the law, without any form of immunity.  The remaining portions of the 1934 NFA, as amended, including the tax requirements, remained in effect and enforceable, and in fact, were enforced even after *Haynes*.

10. In late 1968, Congress substantially amended the National Firearms Act, calling it the National Firearms Act of 1968, and codified same as Tile 26, Chapter 53, U.S.C., and naming the registration database of NFA Firearms the "National Firearms Registration and Transfer Record."

11. The new NFA did several things, including (a) creating the new category of NFA "destructive device", which in summary including such items as bombs, grenades, certain grenade launchers, mortars and artillery pieces, (b) brought machinegun receivers,

conversion kits, and deactivated machineguns into the definition of "machinegun" under the statute (wherein previously they had been generally exempt), (c) abolished the ability of the possessor of an unregistered firearm to register such a firearm, (d) established a 30 day "amnesty" period for possessors of unregistered firearms to register them with the IRS, in November 1968 (including an initial registration period for firearms not previously subject to the registration requirements) and (e) authorized the Secretary of the Treasury (now the Attorney General) to establish as many amnesty periods as he thought appropriate, as long as they did not exceed 90 days, and notice was published in the federal register.

12. That notice of this 1968 "amnesty" or initial registration period was required to be published in government buildings, including post offices, articles on same were published in military newspapers, such as Stars and Stripes, and in fact, in some U.S. Post offices, the amnesty poster was still posted as of 1997, 30 years after the end of the amnesty period.  See Ex. C (amnesty poster).

13. In fact, this 1968 "amnesty" was at least the third NFA Amnesty for NFA firearms since the end of WWII.  (See Ex. D, prior amnesty info)

14. That per the 1968 amendments to the NFA, which remain in effect today,

"The revised statute explicitly states that no information or evidence provided in compliance with the registration or transfer provisions of the Act can be used, directly or indirectly, as evidence against the registrant or applicant "in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence. The scope of the privilege extends, of

course, to the hazards of prosecution under state law for the same or similar offenses."

*Freed v. U.S.*, 390 U.S. 85 (1971).

15. As such, NFA registration records, at a minimum, cannot be used to prove a violation of a statute, other than the NFA, which would include 18 USC 922(o), and the immunity provisions provide for use, not merely transactional immunity, that a registrant would actually be immune from prosecution under 18 USC 922(o), for any registered firearm, even if 18 U.S.C. 922(o)'s "governmental authority" exception, as hereinafter discussed, did not otherwise apply.

16. That on February 20, 2018, President Donald Trump personally directed the U.S. Department of Justice, who at that time was, and on this date remains in charge of the ATF and the NFRTR, and enforcement of the NFA and 18 U.S.C. 922(o), to administratively prohibit so called "bump stocks." (See Ex. O).

17. That on multiple occasions, from the 1980s through the 2010s, and through multiple presidential administrations, by both major political parties, bump firing devices have uniformly been classified by the ATF as (a) not a machinegun, (b) not a NFA device and (c) not a firearm under federal law, and in fact, has been completely federally unregulated.

18. In May, 1986, as part of the so called, Firearms Owners Protection Act, Congress enacted 18 U.S.C. 922(o), which purported to, and purports to outlaw, for the first time, at the federal level, machineguns, but (a) grandfathered machineguns lawfully possessed prior to the enactment of 922(o), and (b) exempted machineguns possessed or transferred by,

or under the authority of a governmental entity.  Firearm Owners' Protection Act, Public Law 99-308, approved May 19, 1986.

19. On December 18, 2018, the DOJ announced, officially, that it was reclassifying certain bump type devices as "machineguns" that it was amending the C.F.R., including its interpretation of certain words, to reflect this change, and that persons who possess such newly classified machineguns, which were literally legal to manufacture and transfer without federal restriction the day before, must either (a) destroy the item or (b) surrender same to ATF, without compensation of any kind, within 90 days of formal publication in the federal register.  (See. Ex. P).  It is unknown if the ruling has actually been published in the federal register as of the date of filing, but if not, it is expected imminently.

20. That ATF and DOJ incorrectly, expressly and unambiguously found that they had no authority to open a registration period, like the 1968 "amnesty" on account of 18 USC 922(o), for these newly regulated bump devices, which were totally exempt from federal regulation the day before.  Ex P.

21. That per DOJ finding, there are approximately 500,000 bump fire devices, which were sold legally in the United States, presently in private civilian non governmental possession, and are worth approximately between $200.00 and $500.00 each.  Ex. P.  In truth and fact, there are likely as many as double that many, as the DOJ numbers do not into consideration pre-2010 produced devices, which have been sold since at least the 1980s, or smaller custom manufacturers who copied the devices, all of which with either express ATF approval, or non-action by the ATF when made aware of same.

22. That contrary to the finding of the DOJ and ATF, the ATF and DOJ does, in fact, have the authority and power to implement an "amnesty registration period not to exceed 90

days." Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968.

23. That per 18 U.S.C. 922(o)(b), said statute does not apply to machineguns possessed or transferred by or under the authority of a governmental entity.  The amnesty provision of the NFA is an express grant of governmental authority to legitimize what would otherwise be unlawful contraband, and the interpretation of the DOJ and ATF to the contrary, is both arbitrary and capricious, and expressly in violation of the ATF's own NFA branch handbook, which makes clear that ATF retains the amnesty power, and has not instituted a post-1968 amnesty, "… principally because additional periods could jeopardize pending ATF investigations and prosecutions of NFA violations.".  Ex M, p. 23, para 3.2.1.

24. In that Defendants do have the authority to institute an "amnesty registration period not to exceed 90 days[,]" pursuant to Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968, and that said amnesty would:

    A:    Provide use immunity, such that the NFA registration form could not be used to prosecute, directly or indirectly, an allegedly violation of 18 U.S.C. 922(o), and

    B:    Provide transactional immunity, such that a person registering a firearm during an NFA amnesty could not be prosecuted for an alleged violation of 18 U.S.C. 922(o), for a registered firearm, and

    C:    That a firearm registered during a NFA amnesty registration period is not subject to 18 U.S.C. 922(o), as a NFA amnesty is instituted under the Authority of the Attorney General of the United States, with possession

allowed under Section 207(d) of the Gun Control Act of 1968, and thus

falls into the second exception of 18 U.S.C. 922(o).

25. That the Southern District of Illinois, Judge David Herdon, has declared 18 U.S.C.

922(o), unconstitutionally vague, when being applied to a police officer who owned and

possessed a M16 Machinegun with the alleged permission of the Illinois State Police.

See U.S. v. Vest.  The decision was never appealed.

26. In fact, the "governmental authority" section of 18 U.S.C. 922(o), is vague and

ambiguous, and under the Rule of Lenity, to the extent there is question of its

applicability, should be construed to allow an amnesty / initial registration period.

27. That the Defendant's finding that they lacked the authority to institute an amnesty / initial

registration period, and that 18 U.S.C. 922(o) would either facially, or as applied, prohibit

an amnesty, they have acted arbitrarily, capriciously and contrary to law.

28. That this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331, and the

Administrative Procedures Act.

29. That this Court has the power to decide these issues and remand this matter back to the

U.S. Department of Justice, and Bureau of Alcohol, Tobacco, Firearms and Explosives,

with directions to reconsider its actions, in light of this Court findings of fact and

conclusions of law.

30. That Plaintiff, and the proposed Plaintiff class, would be irreparably harmed, in the event

that the existing proposed regulations went into effect, and thus, this Court should enjoin

same, pending a resolution on the merits, and/or remand to the Administrative Agency.

WHEREFORE, Plaintiff, humbly requests that this Court find that Defendants have the

discretion to afford an "amnesty" registration period, under Section 209 of the Gun Control

Act, for items classified and/or reclassified as NFA Firearms and/or machineguns,

notwithstanding 18 U.S.C. 922(o), that said amnesty would provide for use and transactional

immunity for said registered firearms, thus prohibiting application of 18 U.S.C. 922(o),

and/or 18 U.S.C. 922(o)'s governmental authority clause is applicable to amnesties and/or

firearms registered during same, and that by failing and refusing to afford an amnesty

registration period and/or grandfathering of same, Defendants have abused their discretion

and acted arbitrarily and capriciously, and ordering Defendants to institute an amnesty

registration period, published in the federal register, for all firearms classified and/or

reclassified as NFA Firearms and/or machineguns, plus attorney fees under the Equal Access

to Justice Act, and the Administrative Procedures Act, and for such other, further and

different relief as allowed by law and consistent with this Court of the Complaint.

## COUNT II
### (18 U.S.C. 922(o) Does Not Prohibit An Initial Registration Period / Amnesty as It is Facially Unconstitutional as Being In Excess of the Commerce Clause)

1 – 21. Plaintiff adopts and incorporates paragraphs 1 through 21 as thought restated herein.

22.     That to the extent that 18 U.S.C. 922(o) is interpreted by the Court as prohibiting a post

May 1986, machinegun amnesty, it is unconstitutional on its face, as being in excess of the

authority granted to Congress under the commerce clause, the purported basis of its authority.

23.     That 18 U.S.C. 922(o), has no jurisdictional limitation, and both facially, and as actually

enforced, it reaches completely intrastate conduct of a non-commercial nature, such as the

possession of a machinegun inside the confines of one's own home.

24.     Under the commerce clause, Congress may regulate three things:

  A:  First, Congress may regulate the use of the channels of

     interstate commerce.

B:      Second, Congress is empowered to regulate and protect

the instrumentalities of interstate commerce, or persons or things

in interstate commerce, even though the threat may come only from

intrastate activities.

C:      Finally, Congress' commerce authority includes the power to regulate those

activities having a substantial relation to interstate commerce.

25.     That possession of a firearm is not a channel of interstate commerce, especially in one's

own home.

26.     That possession of a firearm, especially in one's own home, in not an instrumentality of

commerce, and without more, is not in interstate commerce.

27.     That mere possession of a firearm is not an activity that has a substantial relation on

interstate commerce, especially in light of the detailed regulatory regime of the National

Firearms Act, which requires machineguns to be marked with the manufacturer's name, address,

model and serial number, and registered, and that interstate movement of a machinegun be

expressly approved by the U.S. Government, and record of same permanently kept by the U.S.

Government.

28.     In light of the foregoing NFA regulations, it is easy to identify contraband machineguns,

or machineguns that have moved in interstate commerce, as there is a record of legitimate

government approved interstate movement, and the requirement of markings and registration of

legitimate machineguns, thus, it is neither necessary, nor proper to regulate totally intrastate

activity to insure compliance with the interstate regime.

29.     That, in light of existing NFA regulations, there is no legitimate interstate market on

machineguns, except as expressly approved by Defendants, and contraband machineguns are

easily identified by their lack of required markings, lack of registration data and/or lack of interstate movement approval, if any.

30.    That contrary to the finding of the DOJ and ATF, the ATF ad DOJ does, in fact, have the authority and power to implement an "amnesty registration period not to exceed 90 days." Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968, as 18 U.S.C. 922(o) is unconstitutional.

31.    That as 18 U.S.C. 922(o) is unconstitutional, its basis as a denial of an NFA amnesty, following the reclassification of the bump firing devices, which were unregulated prior to the reclassification, is both arbitrary and capricious.

32.    That this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331, and the Administrative Procedures Act.

33.    That this Court has the power to decide these issues and remand this matter back to the U.S. Department of Justice, and Bureau of Alcohol, Tobacco, Firearms and Explosives, with directions to reconsider its actions, in light of this Court findings of fact and conclusions of law.

34.    That Plaintiff, and the proposed Plaintiff class, would be irreparably harmed, in the event that the existing proposed regulations went into effect, and thus, this Court should enjoin same, pending a resolution on the merits, and/or remand to the Administrative Agency.

WHEREFORE, Plaintiff, humbly requests that this Court find that 18 USC 922(o) is unconstitutional, that Defendants have the discretion to afford an "amnesty" registration period, under Section 209 of the Gun Control Act, for items classified and/or reclassified as NFA Firearms and/or machineguns, notwithstanding 18 U.S.C. 922(o), and that by failing and refusing to afford an amnesty registration period and/or grandfathering of same, Defendants have abused their discretion and acted arbitrarily and capriciously, and ordering Defendants to institute an

amnesty registration period, published in the federal register, for all firearms classified and/or

reclassified as NFA Firearms and/or machineguns, plus attorney fees under the Equal Access to

Justice Act, and the Administrative Procedures Act, and for such other, further and different

relief as allowed by law and consistent with this Court of the Complaint

### COUNT III
**(18 U.S.C. 922(o) Does Not Prohibit An Initial Registration Period / Amnesty As it Unconstitutional, As Applied, as Being In Excess of the Commerce Clause, in Light of the Regulatory Regime of the NFA and the Non-Fungible Nature of Legitimate Firearms)**

1 – 21. Plaintiff adopts and incorporates paragraphs 1 through 21 as thought restated herein.

22.     That to the extent that 18 U.S.C. 922(o) is interpreted by the Court as prohibiting a post

May 1986, machinegun amnesty, it is unconstitutional as applied to firearms registered in the

National Firearms Registration and Transfer Record, in light of the extensive regulatory regime

applicable to machineguns, short of total prohibition, and the non-fungible nature of legitimate

firearms regulated under the National Firearms Act, which makes it unnecessary and excessive to

regulate totally intrastate conduct in order to regulate the interstate market.

23.     That the National Firearms Act, and related statutes, both in their prior unconstitutional

1934 form, and in their current 1968 form, provide, in relevant part, that every machinegun

manufactured, made or imported, be marked with the name and address of the manufacturer, the

model, if any, and a unique serial number.  That each and every machinegun, except those in the

actual possession of the U.S. Government, is required to be registered in the National Firearms

Registration and Transfer Record, maintained by Defendant, and any transfer of the machinegun,

and any crossing of a state line by a machinegun, is generally required to be approved, in writing,

by Defendant, and import of machineguns is generally prohibited.

25.     In light of the foregoing regulatory regime, it is a fast, inexpensive, simple and definitive

matter to expeditiously determine whether possession, transfer or transport of a given

machinegun is lawful, and simple to determine whether a given machinegun has moved in interstate commerce, both by looking at the actual markings on the item, the approved registration, transfer and movement forms, and/or by reference to the National Firearms Registration and Transfer Record, which retains copies of all registration, transfer and interstate movement documents.

25.     Unlike wheat, marijuana, oranges, or other generally fungible items, machineguns made in accordance with the National Firearms Act can be immediately identified as being both a different item than another, and of interstate, intrastate or foreign origin, as they are marked as such, and registered in a central database maintained by defendants.

26.     That 18 U.S.C. 922(o) is not part of a regime to protect and support commodity prices or production, and is not designed or intended to insure an orderly interstate market or economy, but rather, is a blatant usurpation of the police power of the states of the remaining intrastate market following the interstate regulation in 1934 and 1968.

27.     That as 18 U.S.C. 922(o) is unconstitutional, as applied to firearms registered in the National Firearms Registration and Transfer Record, Defendants finding, in its final rule (Ex P) that it lacked authority to instate a NFA amnesty period to register the newly reclassified bump firing devices in the NFRTR is incorrect, arbitrary and capricious.

WHEREFORE, Plaintiff, humbly requests that this Honorable Court stay enforcement of the reclassification of "bump" type devices until resolution of this case, and finding that 18 US.C. 922(o), is unconstitutional as applied to firearms registered in the NFRTR, Defendants have the discretion to afford an "amnesty" registration period, under Section 209 of the Gun Control Act, for firearms classified and/or reclassified as NFA Firearms and/or machineguns, and that by failing and refusing to afford an amnesty registration period and/or grandfathering of same,

Defendants have abused their discretion and acted arbitrarily and capriciously, and ordering Defendants to institute an amnesty registration period, published in the federal register, for all firearms classified and/or reclassified as NFA Firearms and/or machineguns, plus attorney fees under the Equal Access to Justice Act, the Administrative Procedures Act, and for such other, further and different relief as allowed by law and consistent with this Court of the Complaint.

### COUNT IV
### (18 U.S.C. 922(o) Does Not Prohibit An Initial Registration Period / Amnesty, As It, As Actually Enforced, Is an Unconstitutional Direct Tax)

1 – 21. Plaintiff adopts and incorporates paragraphs 1 through 21 as thought restated herein.

22.     That to the extent that 18 U.S.C. 922(o) is interpreted by the Court as prohibiting a post May 1986, machinegun amnesty it is unconstitutional as applied, administered and actually enforced, as a direct tax, in violation of the Constitution, which prohibits direct taxation.

23.     That despite 18 USC 922(o) being a purported exercise of the commerce power, around the United States, with express approval of the DOJ and ATF, licensed firearms dealers, importers and manufacturers, who pay a yearly "Special Occupational Tax" are allowed to manufacture, import, acquire and possess numbers of "post 1986" machineguns, ostensively for purposes of demonstration and sale to governmental agencies or export, limited only by their financial ability to do so, and/or express political connections with local law enforcement or local politicians, depending on the nature of the license.

24.     In order for the dealer, importer or manufacturer to lawfully obtain and/or retain possession of the post-1986 machinegun, it is required to keep current its federal license, and pay the years Special Occupational Tax.  See Ex M, p. 46, paras 7.5.1, 7.5.2.

25.     Under these circumstances, ATF considers the possession of post-86 machineguns to be possessed under the authority of a governmental entity.

26.     That should the Special Occupational Tax period lapse, without payment of the current tax for the current period, ATF considers the possession of the post-86 machinegun to be unlawful, and no longer under the authority of a governmental entity.

27.     While the Supreme Court, nearly 85 years ago, approved Special Occupational Taxes, that facially produce revenue, under the original NFA, it did so for dealers that were actually engaged in the business of *dealing* in that kind of firearm.

28.     Under the current regime, applying the NFA SOT regime to post-86 machineguns, a dealer, importer or manufacturer that decided to cease operations in NFA firearms for a given period of time, is required, under ATF regulations, to either destroy the post-86 machinegun, or transfer it to another person or entity that can possess it, even if the possession and retention is lawful under the NFA and under state and local law.

29.     At the same time, businesses that are not in the business of manufacturing, dealing or importing NFA firearms, but arguably require the use of post-1986 machineguns, such as ammunition manufacturers for purposes of testing, are tolerated having Type 07 FFL (manufacturer) and Class II SOT (manufacturer), and using same for purposes of acquiring or manufacturing, for internal testing use, post-86 machineguns, and as long as the SOT tax is timely paid, the possession is considered legal.

30.     Notably, Olin, the East Alton, Illinois based ammunition manufacturer, is currently issued a Type 07 (Manufacturers) Federal Firearms License, and is believed to pay a Class II (Manufacturers) Special Occupational Tax, that entitles it to manufacture and sell *firearms*, including post 1986 Machineguns, and is located in the Southern District of Illinois.  Olin routinely test fires machineguns, in East Alton, Madison County, Illinois, in Southern District of Illinois, including in a small indoor range on Powder Mill Road.

31.     Notably, Olin does not manufacture or commercially sell *firearms* of any kind. "Winchester" brand firearms are made and sold by another company under license of Olin. Thus, there is no actual need for Olin to be a Type 07 FFL / Class II SOT, in order to manufacture and sell ammunition, or any of its actual products.  In fact, it costs more money that likely would rather not have to spend.

32.     On the other hand, Olin also is a large contractor for, *inter alia*, military and police small arms ammunition, both domestically and internationally, and is generally required to test said duty ammunition in the firearms they are likely to be used in, such as post 1986 made machineguns.  As noted in Ex. M, page 47, Para. 7.6.2 "The manufacture of machineguns solely for testing or research purposes is not recognized as a legitimate exception to the ban on possession or transfer of firearms under 18 U.S.C. 922(o)."  However, on information and belief, that is exactly what is actually happening, as long as the SOT tax is timely paid, every year, and without regard to whether an NFA firearm is manufactured, imported or sold.

33.     That on information and belief, many, if not most, of the large commercial ammunition manufacturers in the United States, are also doing the same thing as Olin, and thus, as a practical and factual matter, the SOT payment is not being used, as relates to post-1986 machineguns as an "occupational tax", or as a tax on business operations, but rather, despite the title, as actually applied and used as a direct tax on post-1986 machineguns, and thus, is unconstitutional.

34.     Thus, as a practical matter, 18 U.S.C. 922(o), is being unconstitutionally applied, administered and actually enforced, as a direct tax, in violation of the Constitution, which prohibits direct taxation, on post 1986 machineguns.

35.     That as 18 U.S.C. 922(o) is unconstitutional, as applied and enforced, as a direct tax, Defendants, finding in their final rule (Ex P) that they lacked authority to instate a NFA amnesty

period to register the newly reclassified bump firing devices in the NFRTR is incorrect, arbitrary and capricious.

WHEREFORE, Plaintiff, and the proposed Plaintiff class, humbly requests that this Honorable Court stay enforcement of the reclassification of "bump" type devices until resolution of this case, and finding that 18 US.C. 922(o), is unconstitutional as applied and enforced, as a direct tax on post-1986 machineguns, Defendants have the discretion to afford an "amnesty" registration period, under Section 209 of the Gun Control Act, for firearms classified and/or reclassified as NFA Firearms and/or machineguns, and that by failing and refusing to afford an amnesty registration period and/or grandfathering of same, Defendants have abused their discretion and acted arbitrarily and capriciously, and ordering Defendants to institute an amnesty registration period, published in the federal register, for all firearms classified and/or reclassified as NFA Firearms and/or machineguns, plus attorney fees under the Equal Access to Justice Act, the Administrative Procedures Act, and for such other, further and different relief as allowed by law and consistent with this Court of the Complaint.

## COUNT V
### (18 U.S.C. 922(o) Does Not Prohibit An Initial Registration Period / Amnesty, As It, and The National Firearms Act, As Actually Enforced, Is A Violation of Due Process)

1 – 21. Plaintiff adopts and incorporates paragraphs 1 through 21 as thought restated herein.

22.     That to the extent that 18 U.S.C. 922(o) is interpreted by the Court as prohibiting a post May 1986, machinegun amnesty, it and the National Firearms Act itself, is unconstitutional as applied, administered and actually enforced.

23.     In order to comply with due process, a statute must be enforced equally to all classes of persons, fairly, and with notice to all as to what is allowed, what is not allowed, and to more or less equally protect vested rights to property.   It is a basic principle of due process that an

enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend

several important values.

(a)     First, because we assume that man is free to steer between lawful and unlawful

conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to

know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by

not providing fair warning.

(b)     Second, if arbitrary and discriminatory enforcement is to be prevented, laws must

provide explicit standards for those who apply them.  A vague law impermissibly delegates basic

policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis,

with the attendant dangers of arbitrary and discriminatory application.

(c)  Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First

Amendment freedoms,"it "operates to inhibit the exercise of [those] freedoms." Uncertain

meanings inevitably lead citizens to " `steer far wider of the unlawful zone' . . . than if the

boundaries of the forbidden areas were clearly marked."  As this matters intrudes upon sensitive

areas of basic *Second* Amendment freedom, it likewise operates to inhibit the exercise of those

freedoms, and cause citizens to steer far wider of the unlawful zone than if the boundaries were

clearly marked.

24.     From 1969 through an including the present, the NFA and from May, 1986, 922(o) have

been inconsistently and arbitrarily enforced, with inconsistent and often either no notice, or

legally incorrect notice to the public, by Defendants and their predecessors, such that, as a

practical matter, except as to the absolute most routine and common of transactions, said statutes

are enforced on an ad hoc and subjective basis, with the attendant arbitrary and discriminatory

application, and when Defendants change their mind, or are directed to change their mind by a

political superior, or issue such a new interpretation or ruling, or for whatever reason, an innocent person, who complied with all then applicable rules, regulations and laws, is in possession of what was formerly not a NFA firearm, but which, through no action of the innocent possessor becomes an NFA firearm, they afford no way for innocent possessors to come into compliance with the constantly shifting rules, regulations and rulings, except by destruction of previously lawfully acquired property.  "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U. S. 451, 453 (1939).

25.     As stated previously, under the pre-1968 version of the NFA, a possessor of an unregistered NFA firearm was obliged to register same with the IRS, which was declared unconstitutional in 1968 by the Supreme Court, in violation of the 5th Amendment.

26.     That the 1968 Amendments corrected this particular constitutional defect, identified in *Haynes*, under the 5th Amendment, but in so doing, created no ability of possessors of unregistered NFA items to register said items, except during an "amnesty", which was then immediately declared, and the power to declare future amnesties was set forth in the U.S. Code.

27.     In order to insure full public disclosure, notice, no special favors, and correction of the Constitutional defect identified in *Haynes*, in 1968 the U.S. Congress required notices of amnesty registration periods be publicly published in the federal register.  Were such "amnesties" declared whenever there was a reclassification of previously unregulated items, it is likely this regime would be sufficient, and this was likely the intent of Congress, in 1968. However, this has not happened.

28.     That officially, and in public, the IRS, and its later successor enforcement agencies of the NFA, claimed that the registration form, IRS Form 4467, could not and would not be accepted to register a firearm after December 1, 1968.  (See. Ex. C, E, F).

29.     In truth and in fact this was false and misrepresented to the public at large, in violation of the Fourth Amendment, equal protection of the laws, as the IRS, and its successor entities, after 1968, continued to register unregistered NFA firearms for certain military personnel and certain prominent persons, registering hundreds of such firearms, not during any amnesty period, and without notice of ability to do so, in the federal register, through at least 1972, including at least one unregistered WWII German MP40 Submachinegun allegedly registered after the 1968 amnesty by celebrity Hank Williams, Jr, which was later sold on the open market.  (See. Ex. F, Ex. 4467 dated 1969, Ex G, DOJ Memo explaining "amnesty registration" of 17 NFA Firearms, including multiple machineguns in the 1990s, to a former CIA Agent), Ex H, Inspector General Report "There is evidence that the late registration policy was continued between 1974 and 1976 in a small number of cases.").

27.     In fact, on information and belief, in the late 1980s or 1990s, an unregistered Marbles Game Getter, which is a pre-1934 firearm classified as an Any Other Weapon, under the NFA (Ex M, p. 8), was registered to a then active U.S. Marshall, in the Southern District of Illinois, as a "professional courtesy".

28.     Publicly available documents indicate that unregistered, contraband NFA firearms, including machineguns, were "amnesty registered" as late as the 1990s, (and well after the enactment of 18 U.S.C. 922(o)) including 17 specific firearms (including machineguns) that were voluntarily registered to a former Central Intelligence Agency officer named George Fassnacht, after being seized by the ATF.  (See. Ex. G).

29. Due to the secretive nature of the NFRTR, (Ex. M, p. 25, para. 3.4.2) it is unknown specifically how many unregistered contraband firearms were added to the NFRTR after 1968, but it is believed, based on publicly available information, to be in the thousands.

31. That, officially, based on publicly available documents, more than 57,000 NFA firearms were registered or re-registered during the 1968 amnesty.  (See Ex. H).  Many of these firearms were located in what is now the Southern District of Illinois, and which was, in 1968, the Eastern District of Illinois.

32. That while legally circuitous reasoning has been applied to imply that these post 1968 registrations were under the amnesty power, "[t]o date, no additional amnesty periods have been declared."  Ex M, NFA Branch Handbook, P. 24, para. 3.2.1.

33. That not all of these post 1968 Amnesty Registrations were actually made on IRS Form 4467, such that an audit of Form 4467 registrations, which itself would show post 1968 registrations, would not "catch" all of the late registrations, and instead, were made on then current ATF transfer forms, such as ATF Form 5, such as the firearms registered in 1993 by a former CIA agent, such that these types of registration would actually be hidden in the mass of data, and could only be found by a firearm by firearm search, examining the original registration document.

34. In addition, there have been multiple occasions wherein applications to transfer NFA type firearms, wherein the transfer was denied, on the basis that the firearm in question was not registered at all, much less to the transferor, only to have the transferor provide proof that the firearm was in fact registered, and the transfer ultimately approved, both before and after 1986.

35. In addition to the surreptitious registration of firearms after 1968, in 1972 the ATF regulatorily invented, without statutory authorization, in which the ATF recognized, at least impliedly, the inherent defect in the 1968 version of the NFA, in which state and local governmental entities, such as police and museums, who came into possession of unregistered NFA items, by seizure, donation, or otherwise, were technically in violation of felony federal law, as, other than an amnesty, there was no way to register such items, and it was illegal, even for state government employees and entities to possess such unregistered items.  (See also Ex J, and K).  These included historical artifacts of interest only to a museum, and lead to such absurdities as trying to seize the former U.S. Battleship U.S.S. North Carolina, as an unregistered destructive device.

36.  As such, ATF created a program, with no statutory authority to do so, to purportedly "limited" register said unregistered firearms, to a governmental entity, but to limit transfers of said firearms only to other governmental entities, despite the U.S. Supreme Court in the *Freed* case, unequivocally stating that possessors could not register firearms, and nothing in the NFA providing for such limited or non-amnesty registrations, and nothing in the NFA providing for restrictions on transfer of registered firearms.  (Ex. J).

37. In fact, other than the applicability of the transfer tax, state and local governmental entities are treated the same under the NFA as natural persons.  However, ATF has, on several occasions, approved transfer of many said firearms, including machineguns, registered on Form 10, into the possession of non-governmental entities, including the very firearm shown in Exhibit K, which was transferred with ATF approval, to a private collector in Maryland.

38. The BATF and the U.S. Department of Defense has knowingly and intentionally set out to violate the National Firearms Act, by transferring to state and local police departments fully functional machineguns, like M16A1 rifles and M14 rifles, but apparently not transferring the firearms in accordance with the National Firearms Act and the regulations set forth thereunder, but instead, apparently unlawfully sends the machineguns to the receiving entity without ATF paperwork, and directs that ATF Form 10 be filed by the receiving agency upon receipt, even though the U.S. Supreme Court has expressly held that possessors, like the police departments, may not register the firearms (except during an amnesty).  See U.S. v Freed, 1971.  Numerous local police departments in the Southern District of Illinois have Form 10 registered DOD machineguns that were not transferred in accordance with the NFA, with full knowledge of the program by the ATF.

39. That from 1969 through 2016, the IRS, and its successor entities, such as the ATF (and in 1986, the U.S. Congress[1]), on multiple occasions, reclassified certain items, which were previously either completely federally unregulated, or were federally regulated as ordinary Title I Firearms, as NFA firearms, including:

> A:      ATF Ruling 76-6, reclassifying certain TASERs as "any other weapon", but grandfathering those made prior to May 1, 1976 (Ex. I), and

---

[1] In 1986, as part of the Firearms Owners Protection Act, the U.S. Congress expanded the definition of machinegun to include items like drop in auto sears (See ATF Ruling 81-1, attached hereto as Ex. M, page 140), and the definition of silencer was amended to include any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, which were not subject to the NFA previously.  However, the U.S. Congress afforded no opportunity in 1986 for people who previously lawfully acquired these items to register them, in violation of fundamental due process.

B:      ATF Ruling 81-1, reclassifying "drop in auto sears" as "machineguns", but grandfathering those made prior to November 1, 1981 (Ex. M, page. 140), and

C:      ATF Ruling 82-2, reclassifying a KG-9 open bolt pistol as a "machinegun", but grandfathering those made prior to January 19, 1982 (Ex. M, page 142), and

D:      ATF Ruling 82-8, reclassifying certain open bolt pistols as "machineguns", but grandfathering those made prior to June 21, 1982 (Ex. L), and

E:      ATF Rulings 94-1 and 94-2, reclassifying certain shotguns as "destructive devices" but not grandfathering anything, but instead requiring registration, but not setting forth an "amnesty" (Ex M, pages 145 – 149), and

F:      ATF Ruling 95-3, reclassifying 37MM Flare guns as "Destructive Devices" when possessed with certain ammunition but neither grandfathering, nor setting forth a registration period like Rulings 94-1 and 94-2 (Ex. M, p. 149-150).

40. That excluding ATF Rulings 94-1 and 94-2 (dealing with certain "destructive devices"), the ATF, instead of using its "amnesty" powers, to require and afford possessors of these newly classified NFA firearms to lawfully register their firearms, purported to "grandfather" these newly classified AOW and Machineguns, and to apply the NFA only to such items manufactured after the date of reclassification. As such, persons with two identical firearms or two identical classes or types of NFA firearms, both made by the

same manufacturer, and marked in the same way, were treated differently, without statutory basis, with Defendants giving purported legal coverage to persons in possession of unregistered NFA items, including machineguns, which the ATF, after the fact, decided were NFA firearms, yet not wishing to provide an opportunity to actually register them, as unequivocally required by the NFA.

41. That during the 1968 amnesty, the IRS, if it received an amnesty registration form for a 37 MM Flare gun, would stamp the form with a purple stamp stating, "registration not required under the National Firearms Act of 1968", and return same to the applicant, apparently unregistered, and not signed by Harold A Serr, then head of the Alcohol and Tobacco Tax Division of the IRS, which administered the NFA, as it would with an accepted application.

42. Unfortunately, while the ATF, arguably had the authority to grandfather AOWs, as a "collectors items", it did not do so on this basis, and does not list said AOWs in the official Curio and Relics List of items removed from the purview of the NFA as a collectors item, in addition, it had no authority to grandfather drop in auto sears, open bolt semi automatic firearms classified as machineguns, or certain Browning Imported FAL[2] machinegun receivers, that the ATF has administratively exempted from the machinegun classification, despite being identical to otherwise prohibited receivers *United States v. Cash*, 149 F.3d 706 (7th Cir. 1998)( The ruling does not—and cannot--

---

[2] That in the 1970s, the ATF allowed the import of 13 West German type, Belgian made, FAL rifles, built on machinegun receivers, without the full auto parts installed.  Instead of allowing the registration of these machinegun receivers, or requiring the importer, Browning Arms Company, to recover them, the ATF "grandfathered" then by specific serial number, and exempted them from the machinegun classification, even though it has sought prosecution of identical firearms outside of this 13 serial number range.

excuse compliance with criminal laws applicable at the time of post-1981 transfers. …
when section 5845(b) and ATF Ruling 81-4 alike defined auto sears as machine guns;
they therefore had to comply with the laws regulating transfers, such as 26 U.S.C. section
5841(b) ("Each firearm transferred shall be registered to the transferee by the transferor").

43. Therefore, a possessor of newly classified machineguns or other NFA firearms is
required by law to possess or transfer them in accordance with the NFA, but there has
never existed a mechanism, be it an "initial registration period" an "amnesty" or
otherwise, to so register the items, and ATF will not approve the transfers of unregistered
items.

44. On the other had Plaintiff, or anyone else, applied to make and register such an NFA
device, prior to the date of reclassification, the ATF would have denied the application on
the basis that the application was to make and register a non-NFA firearm.  In fact, at no
time in history, prior to December, 2018, would a bump stock have been registerable as a
machinegun, even if the owner had been psychic and anticipated such regulation 50 years
after the 1968 amnesty.

45. Furthermore, otherwise NFA firearms using fixed ammunition are antique firearms, and
as such exempt from the NFA, if the weapon was actually manufactured in or before
1898 and the ammunition for the firearm is no longer manufactured in the United States
and is not readily available in the ordinary channels of commercial trade. To qualify as an
antique firearm, a fixed cartridge firing NFA weapon must meet both the age and
ammunition availability standards of the definition.

46. However, ATF has noted (Ex M, p. 20, para. 2.2) that, "[c]oncerning ammunition
availability, it is important to note that a specific type of fixed ammunition that has been

out of production for many years may again become available due to increasing interest in older firearms. Therefore, the classification of a specific NFA firearm as an antique can change if ammunition for the weapon becomes readily available in the ordinary channels of commercial trade."  But if this happens, there is no mechanism to register this formerly non-NFA item, which became a NFA item, through no fault or action of the owner.

47. When ATF reclassified certain shotguns as destructive devices, it did open a seven year long open registration period for the shotguns but failed to publish notice of any amnesty in the Federal Register, and did not limit the registration period to 90 days, as required by law.  (Ex N).  In fact, ATF did not even publish a form to accomplish the registration, but instead required registrants to fill out an ATF Form 1, Application to Make and Register a Firearm[3], and then mark out portions and write extra boxes, as appropriate. Nothing was published in the federal register related to the foregoing..

48.   As a result, there is serious and legitimate question on the legality of the registration of these shotguns.

49. In May, 1986, as part of the so called, Firearms Owners Protection Act, Congress enacted 18 U.S.C. 922(o), which purported to, and purports to outlaw, for the first time, at the federal level, machineguns, but (a) grandfathered machineguns lawfully possessed prior to the enactment of 922(o), and (b) exempted machineguns possessed or transferred by, or under the authority of a governmental entity.  Firearm Owners' Protection Act, Public

---

[3] Prior to the 1968 amendments to the NFA, an IRS Form 1 (firearms) was used to register an unregistered firearms.  A IRS Form 1A (Firearms) was used to "make" a new NFA Firearm and register same.  After the 1968 Amendments, a Form 1 was used to "Make and Register" a NFA firearm, and there was no form to register an unregistered NFA firearm, after the 1968 amnesty.

Law 99-308, approved May 19, 1986.  Bump type firing devices were not classified as

machineguns on the date of this enactment, and were sold for years on the open market,

after this 1986 enactment, and Congress clearly did not intend to prohibit bump stocks

with this statute.  The Statute, in sum total, states as follows:

"(*o*)(1) Except as provided in paragraph (2), it shall be unlawful for any

person to transfer or possess a machine gun.

> (2) This subsection does not apply with respect to

>> (A) a transfer to or by, or possession by or under the authority of, the

>> United States or any department or agency thereof or a State, or a

>> department, agency, or political subdivision thereof; or

>> (B) any lawful transfer or lawful possession of a machine gun that was

>> lawfully possessed before the date this subsection takes effect."

50. That while 18 USC 922(o), on its face, though as clear as mud, provides no exception for

post 1986 machineguns, by importers, dealers or manufacturers, the ATF has, by

administrative regulation, purported to allow same, for purposes of export and sale to

domestic governmental entities and other importers, dealers or manufacturers,

unconnected to the immunity arguments advanced elsewhere in this complaint.

51. In addition, while, since 1986, the ATF has, at least officially, not allowed new

manufacture of machineguns for private sale, it has, since 1986, and through at least the

early 2000s, has been aware of, and chosen to take no enforcement action, when, among

others, the Colt Firearms Company, of Hartford Connecticut, apparently took existing

registered pre-86 M16 type machinegun receivers, and replaced them with post 1986

manufactured M16 receivers, with the same serial number, make, model and

manufacturers markings, in order to appear to be original pre-1986 receivers, but which were identified in later sales ads, by advanced collectors, as having features that did not and could not exist in or before 1986.

52. On information and belief, many to most of the remanufactured Colt receivers, were remanufactured for prominent and/or politically connected persons, due to Colt's longstanding policy of restricting sales and services for such items from ordinary consumers, even if the ordinary consumer was legally eligible to buy or possess same.

53. In fact, around the United States, licensed firearms dealers, importers and manufacturers, who pay a yearly "Special Occupational Tax" are allowed to manufacture, import, acquire and possess numbers of "post 1986" machineguns, ostensively for purposes of demonstration and sale to governmental agencies or export, limited only by their financial ability to do so, and/or express political connections with local law enforcement or local politicians, depending on the nature of the license[4].  In order for the dealer, importer or manufacturer to retain possession of the post-1986 machinegun, it is required to keep current it federal license, and pay the years Special Occupational Tax.  See Ex M,

---

[4] Generally, in order for a SOT dealer to obtain a post-1986 machinegun, he is required to submit, along with the transfer application, what is euphemistically referred to in the firearms industry as a "love letter", in which the Sheriff, Chief of Police, of other "suitable" person provides a letter to the dealer indicating a desire to see such a machinegun demonstrated for purposes of possible sale.  However, no objective standard exists to obtain such a letter or sales sample, and thus, as often as not, such "love letters" are provided based on matters other than the lowest bidder, dealer service, or the like, and instead, many are provided as unabashed political favors, nepotism, or personal relationships, and the requirement for a "love letter" is almost perfectly designed to encourage this kind of conduct, that while perhaps "not illegal", is far from an equal playing field.  SOT manufacturers, on the other hand, may manufacture and "stockpile" unlimited numbers of machineguns, ostensively for sale to governmental entities or export, without any such "love letter", and may acquire post-86 machineguns from SOT who are discontinuing their business without a "love letter", though otherwise is generally subject to the same rules as SOT dealers.

p. 146, paras 7.5.1, 7.5.2.  Under these circumstances, ATF considers the possession of post-86 machineguns to be possessed under the authority of a governmental entity, even if no governmental entity actually requested the item, or is likely to procure it, or a firearm like it.

54. Failure to pay the tax timely, or keep the licenses current, makes continued possession of the post-1986 machinegun unlawful, even though it is lawful to retain other types of NFA items, and/or the machinegun never crossed a state line, and never moved in or affected in any way, interstate commerce, and due to required markings of the NFA, it is known exactly who made the item, when and where, and thus, is not a fungible item that cannot be determined whether it has moved in interstate commerce, or not.

55. At the same time the above items were reclassified as machineguns, and afforded no legal possibility to register same in the NFRTR, the Defendants (or their predecessors in office) would also, from time to time, arrest and prosecute persons who were in possession and selling what were claimed by the possessors to be "grandfathered" machineguns not requiring registration, with the ultimate decision of the U.S. Court of Appeals for the 7th Circuit, affirmed that they could not take advantage of ATF ruling grandfathering pre-1982 DIAS, as ATF had no power to grandfather same, and that the possessors should have registered said DIAS, even though the Seventh Circuit was apparently unaware that, except during an amnesty period, the Supreme Court has ruled that "mere possessors" of firearms cannot register them, and with the 1986 enactment of 18 U.S.C. 922(o), which expressly included the definition of drop in auto sears into the statutory definition of machinegun, making it impossible to actually register said items,

as no amnesty or initial registration period was offered after any of the events reclassifying DIAS as machineguns.

56. The result is that 922(o), and the NFA, is unconstitutional, in that as actually administered by the current ATF, and its prior incarnations, going back to the IRS in 1969, violates due Forth Amendment due process and administratively destroys the value of lawfully acquired property, in that:

> (a) After the 1968 Amnesty, persons were either permitted, or not permitted, to register unregistered firearms, at the whim of the IRS and later the ATF, without notice as required in the federal register, and publicly and officially denying same when asked by any person so interested, and

> (b) After the 1968 Amnesty, including after the enactment of 18 U.S.C. 922(o), allowing the registration of unregistered firearms to persons like former CIA agents, certain federal law enforcement officers and certain celebrities, and

> (c)  the ATF and/or the U.S. Congress, reclassified, on multiple occasions, after a given product was marked to the public at large with ATF permission, multiple devices as NFA devices, including machineguns, purporting to grandfather same, without lawful authority to do so, and leaving possessors of same no lawful options as to their previously lawfully acquired property, and

> (d) in the case of certain shotguns, providing for an unlawful and illegal registration period not in accordance with federal law, and

> (e) in the case of 37 mm flare guns, refusing to register same during the amnesty, but thereafter ruling that they may be destructive devices, but affording no new amnesty, and

(f)  in the case of antiques, which were at one time exempt from the NFA, which later became NFA items, offering no mechanism of registration, and

(g)  by destroying, misplacing or otherwise causing, either intentionally or through negligence, cease to exist in the official database, records of lawful registration, which has actually resulted in Defendant's denying transfers of lawful firearms and seeking to seize them, only to end in proof of registration being presented and the transfer approved,

(h)  creating an unlawful special registration program, with no statutory or legal authority, for state and local governmental entities, and then inconsistently applying the alleged limitations on transfer, and

(i)  reclassifying as machineguns, in 2018, bump type devices, which were sold with express ATF authorization, and which the ATF impliedly recognized that it lack the authority to grandfather machineguns (though without actually analyzing the issue in the ruling), like it did in ATF Rulings cited herein, but also refused an initial registration period, to allow compliance with the NFA

57. That this Court has subject matter jurisdiction, under the Administrative Procedures Act, under the U.S. Constitution and the Fourth Amendment, and 28 U.S.C. 1331.  Plaintiff brings this action challenging a final administrative determination which affects him in the Southern District of Illinois.

58. That at all times relevant, Defendants had and have a duty to act in accordance with the law, not to act in an arbitrary and capricious manner, to provide equal protection of the law and not to enforce unconstitutional statutes, or enforce statutes in an unconstitutional manner.

59. In violation of this duty, Defendants have acted as heretofore alleged.

60. As a proximate cause of the foregoing, Plaintiff has been deprived of the benefits and protections of the law, of their rights to property, due process of the law and to certainty as to the law.

61. That in light of 50 years of inherently unequal administration of the revised 1968 version of the NFA, and now 30 years of 18 U.S.C. 922(o), as applied, these statutes are unconstitutional as applied to Plaintiff, and all other persons in the same class as him.

62. That contrary to the finding of the DOJ and ATF, the ATF ad DOJ does, in fact, have the authority and power to implement an "amnesty registration period not to exceed 90 days." Section 207(d) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968, as 18 U.S.C. 922(o) is unconstitutional.

63. That as 18 U.S.C. 922(o) is unconstitutional, its basis as a denial of an NFA initial registration period / amnesty is both arbitrary and capricious.

64. That this Court has the power to decide these issues and remand this matter back to the U.S. Department of Justice, and Bureau of Alcohol, Tobacco, Firearms and Explosives, with directions to reconsider its actions, in light of this Court findings of fact and conclusions of law.

65. That Plaintiff would be irreparably harmed, in the event that the existing proposed regulations went into effect, and thus, this Court should enjoin same, pending a resolution on the merits, and/or remand to the Administrative Agency.

WHEREFORE, Plaintiff, humbly requests that this Court find that 18 USC 922(o) is unconstitutional, that Defendants have the discretion to afford an "amnesty" registration period, under Section 209 of the Gun Control Act, for items classified and/or reclassified as NFA

Firearms and/or machineguns, notwithstanding 18 U.S.C. 922(o), and that by failing and refusing to afford an "amnesty" registration period, Defendants have abused their discretion and acted arbitrarily and capriciously, and ordering Defendants to institute an amnesty registration period, published in the federal register, for all firearms classified and/or reclassified as NFA Firearms and/or machineguns, plus attorney fees under the Equal Access to Justice Act, and the Administrative Procedures Act, and for such other, further and different relief as allowed by law and consistent with this Court of the Complaint.

## COUNT VI
### (That Defendants Had Instituted a Taking Requiring Just Compensation)

1 – 21. Plaintiff adopts and incorporates paragraphs 1 through 21 as thought restated herein.

22.      That should this Court find that the DOJ and/or ATF has the authority to reclassify bump type devices as machineguns, and not to grandfather same, for to allow an "amnesty" registration of the firearm in the NFRTR, without violation of 18 USC 922(o), and that 18USC 922(o) and the National Firearms Act is constitutional, both facially and as applied, then said constitutes a "taking" of private property, without just compensation, in violation of the 5th Amendment, in that possessors of previously legal and government approved property have been required to either destroy or surrender to government agencies their previously lawful property without compensation, either just, or otherwise, and in any event, totally destroys any market value of the items that previously existed.

23. Venue is proper in this judicial district.

24. That per DOJ estimates there are about 500,000 bump stocks in public circulation.  In truth and fact, the number is likely higher, but definitely above 500,000.

25. That per DOJ estimates, each bump stock has a fair market value of between $250 and $500, for a taking of private property of between $125,000,000 and $250,000,000 (one hundred twenty five million to two hundred and fifty million dollars).

26.    That Plaintiff proposes the following class:

> "All persons who possess a "bump stock" in December, 2018, that was classified as a machinegun in Ex. P, excluding members of the Court, Plaintiff's counsel and named plaintiffs in other civil cases seeking just compensation for the same event."

27. That it is proposed that the Plaintiff Class be represented by John Doe, as class representative, and Thomas G. Maag and the Maag Law Firm, LLC, as class counsel.

28. That all of the requirements of a class action are met, and neither the class representative, nor the proposed class counsel have any interests contrary to the interest of the class.

29. That common issues of law and fact include:

A:     Does the action of Defendants Constitute a taking requiring just compensation.

B:     If the answer to the above is in the affirmative, what is the proper amount of just compensation.

30. That this Court has the power to decide these issues, pursuant to the 5th Amendment and 28 U.S.C. 1331.

31. That Plaintiff, and the proposed Plaintiff class, would be irreparably harmed, in the event that the existing proposed regulations went into effect, and thus, this Court should enjoin same, pending a resolution on the merits, and should require Defendants to keep track of any and all bump stocks actually surrendered, in order to insure proper notice and compensation to the class.

WHEREFORE, Plaintiff, and the proposed Plaintiff class, humbly requests that this Honorable

Court certify the foregoing class, appoint the foregoing class representative and class counsel,

entering judgment in favor of the Plaintiff and proposed class in the amount of $250,000,000.00

(two hundred and fifty million dollars) plus attorney fees under the Equal Access to Justice Act,

otherwise awarding class counsel reasonable litigation costs and attorney fees, and for such

other, further and different relief as allowed by law.

Dated:  January 2, 2019

Respectfully Submitted,
John Doe,

By:s/Thomas G. Maag
Thomas G. Maag
Maag Law Firm, LLC
22 West Lorena Avenue
Wood River, IL  62095

Phone:  618-216-5291
tmaag@maaglaw.com